UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID DUTRA,

    Petitioner,

v.

DEPARTMENT OF CORRECTIONS AND REHABILITATION, AND ANTHONY KANE, Warden,

    Respondents.

No. C 06-0323 MHP

**MEMORANDUM & ORDER**
**Re: Petition for Writ of Habeas Corpus**

    Petitioner David Dutra, a California prisoner now incarcerated at the Correctional Training Facility in Soledad, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. section 2254. Dutra asks that this court direct respondents to: (1) vacate the prison disciplinary board's decision finding him guilty of a disciplinary violation, including any reference to the same; and (2) expunge the associated disciplinary charges. His petition is now before the court for review pursuant to 28 U.S.C. section 2243 and Rule 4 of the Rules Governing Section 2254 Cases.

BACKGROUND[1]

    Dutra, currently serving an indeterminate fifteen-year-to-life sentence for second degree murder, is challenging a prison disciplinary decision which found that he violated California Code of Regulations ("CCR") section 3005(a) by attempting to undermine the Catholic Chapel Program ("CCP") at the California Men's Colony where he was incarcerated.

    Dutra, along with several other inmates—Steven Murphy, James Marvin, Benny Ros, and Gerald Shil ("alleged co-conspirators")[2]— were long-term participants in the CCP under the direction of Father Alphonse Van Guilder. Pet. at 4. Father Alphonse retired in January 1999. Id. In November 2000, Father R. Francis Stevenson was hired as the Catholic Chaplain for the CCP. Id. At this time, Dutra had been active in the CCP for sixteen years and had been appointed Eucharist

1  Minister, Master of Ceremonies for Bishop Ryan's service, sacristan, and volunteer clerk at various
2  times. Id. He also performed altar duties. Id. Nevertheless, in early 2001, Dutra quit the CCP.
3  Dutra contends that Father Stevenson altered the style of the CCP "from a conventional style
4  that conformed to Catholic tradition and belief to an unorthodox, militaristic program . . . contrary to
5  Catholic dictates and tradition." Id. at 5. Dutra states that his decision to withdraw from the
6  program was a direct result of the changes made by Father Stevenson and that this decision was
7  individual, made on the basis of personal beliefs and feelings about the program. Id.
8  The alleged co-conspirators also withdrew from the program during the same period. Id.
9  Dutra states that he "did not conspire, agree, or even consult with" the other inmates in their
10 individualized decisions to dissociate themselves with Father Stevenson and the CCP. Id. at 6. To
11 this end, he argues that over 100 other inmates withdrew from the program during this period. Id.
12 In February 2003, Father Stevenson was transferred to another prison. Pet., Exh. E at 2.
13 While volunteering with the CCP, Dutra and the alleged co-conspirators enjoyed
14 considerable freedom at the chapel office, where they were unsupervised during the approximately
15 twenty-two month period prior to Father Stevenson's arrival. Ans. at 2. Dutra worked in the chapel
16 office where he was in charge of all the equipment. Ans., Exh. 3 at 6. Dutra and the alleged co-
17 conspirators controlled the flow of paperwork in the chapel office, which permitted them to control
18 which inmates were able to have outside visitors attend family services. Id. Some of the alleged co-
19 conspirators also used the chapel bathroom for trysts with their wives and stole food from the family
20 service banquets to sell on the yard. Ans. at 2. Dutra and the alleged co-conspirator's control of the
21 chapel office was common knowledge among the prison's Catholic population who acknowledge
22 that it was Dutra's "domain" and that he and the alleged co-conspirators were "running the
23 programs." Ans., Exh. 3 at 6.
24 After his arrival, Father Stevenson prohibited Dutra and the alleged co-conspirators from
25 using the chapel office without supervision. Ans. at 2. In response, Dutra and the alleged co-
26 conspirators became angry and began to agitate other inmates in an effort to decrease participation in
27 the CCP. Id. at 3. They also began making threatening statements. Ans., Exh. 10 at 7. On several
28 occasions Dutra was heard making statements such as "[Father Stevenson] won't be around much

longer" and "that priest has to go." Ans. at 10. Later, Dutra was reprimanded after becoming "visibly disturbed" and "very upset" when Father Stevenson hired a new clerk to work in the chapel office. Ans., Exh. 3 at 6. This anger persisted over a period of months, during which time Dutra and the alleged co-conspirators discouraged participation in the CCP in a coordinated effort to have Father Stevenson removed. Ans., Exh. 3 at 2. Matters reached a critical point when fellow inmates began to feel that Dutra and the alleged co-conspirators had "crossed the line" by promising to "take [Father Stevenson] down." Ans., Exh. 10 at 7.

On January 2, 2002 Dutra and the alleged co-conspirators were placed in administrative segregation and charged with disciplinary violations. Pet. at 6. The inmates were charged with conspiring to: (1) dissuade the free participation of the other inmates in the Catholic religious program; (2) make statements of a threatening nature against Father Stevenson; and (3) negatively affect the employment of Father Stevenson. Ans., Exh. 3 at 1.

Dutra requested an investigative employee ("IE") and, on January 30, 2002, Correctional Officer R.B. Torres was assigned to assist him with his disciplinary hearing. Id. at 5. Dutra stated that he had no objections to Officer Torres serving as his IE. Id. Subsequently, Officer Torres interviewed Dutra, Father Stevenson, Lieutenant Wiley, Visiting Lieutenant Fisher and an inmate witness, Guillermo Anzoategui. Id. at 6. Anzoategui stated that Dutra worked in the Chapel Office which "was his domain" and where he was in "control of all the equipment." Id. Anzoategui also stated that the five inmates involved in the alleged conspiracy frequently had outside visitors at family services and often "misplaced or lost" the paperwork of other inmates who had submitted requests for their visitors to attend family services. Id. Father Stevenson's statement pertained to the inmates' change in behavior after he prohibited them from staying in the Chapel Office without supervision. Id. Specifically, Father Stevenson stated that in March or April 2001 an unidentified inmate notified him that Dutra's friend, and alleged co-conspirator, Benny Ros, had stated that "we got to take this Chapel down." When confronted about this statement, Ros replied, "what do you expect?" Id. Torres' report also revealed that Father Stevenson was usually by himself in the Catholic Chapel. Id.

3

At the conclusion of his report, dated February 15, 2002, Officer Torres indicated that Dutra had requested his presence at the hearing the following day. Id. at 7. The report also indicated that Dutra did not request the presence of the Reporting Employee— Lieutenant Wiley— at his hearing. Id. Dutra also declined to have staff or inmate witnesses present at his hearing. Id.

Prior to his hearing, Dutra was notified that confidential material was being considered and was given a summary of the confidential information. Ans., Exh. 8 at 1–2. This material was compiled in a written report based on an internal investigation conducted by Lieutenant Wiley ("Wiley Report"). Ans. at 2–3. It was based in part on Wiley's interviews with staff and inmates. Id. at 2. In this report, Wiley concluded that Dutra had conspired with the alleged co-conspirators to undermine attendance at the Catholic Chapel service. Id. The report also found that Dutra and the alleged co-conspirators had threatened Father Stevenson. Id. The Wiley Report was kept confidential during the disciplinary proceeding because it was determined that the information, if known to Dutra, would endanger persons and jeopardize the security of the institution. Ans., Exh. 3 at 1.

On February 16, 2002 Dutra received a prison disciplinary hearing. Id. at 1. At the hearing, Dutra acknowledged that he had received copies of the charges and all pertinent documents at least twenty-four hours prior to the hearing. Id. at 1. Dutra did not request any additional materials at the hearing. Id. at 3. Although Dutra initially requested that Officer Torres be called as a witness, he revoked his request at the time of the hearing. Id. At the outset, the Senior Hearing Officer advised Dutra that confidential information would be considered, that the identity of the confidential inmate sources would not be divulged and that the confidential information provided had been scrutinized and was determined to be reliable under CCR section 3321(c). Id. at 1. The Senior Hearing Officer explained the purpose of the hearing and the Rules Violation Report was read aloud. Id. at 3. Dutra stated that he was in good health and ready to proceed with the hearing. Id. In March 2002 Dutra, while still in prison, was found guilty of the disciplinary charge of attempting to undermine the CCP. Id. at 4. At the time, Dutra had served seventeen years of his sentence without receiving a single disciplinary violation. Pet. at 4.

4

In two subsequent parole hearings, on August 31, 2004 and September 6, 2006, the Board of Parole Hearings ("the Board") denied Dutra parole. Ans. at 3. In the most recent hearing, the Board mentioned, but did not cite as a basis for denial, Dutra's disciplinary charges. Ans., Exh. 9 at 83–90. The Board commended Dutra for graduating from high school, taking college courses, participating in twelve years of therapy, completing a sewing machine repair vocational program, receiving good work reports and support letters and volunteering in Catholic services. Id. at 84–85. In rendering its decision, the Board emphasized that the commitment offense had been "carried out in an especially cruel and callous manner." Id. at 83. The Board also expressed concern that the "offense was carried out in a dispassionate manner." Id. Specifically, the Board noted that petitioner knocked the victim down to the ground, left the room to cool off, returned to beat her about the head and body with a two-by-two, left to cool off a second time and came back one last time to strangle the victim to death. Id. Finally, the Board lamented that "it's hard to tell what level of insight you have because . . . you focus a lot [on] yourself, and you didn't really show a lot of remorse for the victim or your daughter." Id. at 84. The Board's decision to deny parole was based on the nature of Dutra's commitment offense and out of concern that he lacked sufficient insight. Id. at 83–90.

Dutra sought relief in the California courts. The San Luis Obispo County Superior Court denied his petition for writ of habeas corpus on January 14, 2004 in a reasoned order. Ans., Exh. 10 at 8. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review. Ans., Exhs. 11-13. Dutra then filed this federal petition for writ of habeas corpus. Respondent answered and petitioner filed a traverse. The matter is now ready for a decision on the merits.

The parties' papers present two broad issues which the court will address in turn. First, respondent argues that Dutra failed to properly invoke this court's federal habeas jurisdiction because he cannot establish that expungement of his prison disciplinary violation is "likely" to accelerate his eligibility for parole. Second, assuming that he can establish habeas jurisdiction, Dutra argues that he was not afforded due process when the prison disciplinary board found him guilty of attempting to undermine the CCP because they failed to disclose the confidential Wiley Report and because the evidence relied upon did not meet the "some evidence" standard.

5

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. section 2254. 28 U.S.C. § 1331. Venue is therefore proper in either the district of confinement or the district of conviction. See Laue v. Nelson, 279 F. Supp. 265, 266 (N.D. Cal. 1968) (Weigel, J.). Venue lies in this district because Dutra is incarcerated in the Correctional Training Facility in Soledad, California, which is in the Northern District of California.

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in this petition.

## LEGAL STANDARD

This court is required to analyze state habeas corpus claims under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that this court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Specifically, 28 U.S.C. section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126–27 (9th Cir. 2006). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court has interpreted AEDPA to require a district court to uphold the state court's decision unless that decision was an objectively unreasonable application of a clearly established federal law. Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

Accordingly, this court will review the last reasoned state court opinion under the standards outlined in AEDPA. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006). Here, the last reasoned state court opinion occurred in the California Superior Court for the County of San Luis Obispo ("Superior Court"). This court will apply the AEDPA standard to the Superior Court proceeding to determine whether it was an "objectively unreasonable" denial of parole.

DISCUSSION

Before the Superior Court, Dutra asserted multiple claims in support of his petition for a writ of habeas corpus. The Superior Court, however, considered only three of Dutra's claims, stating that "[s]ince these were the only bases on which the [Dutra] exhausted [his] administrative remedies, these are the only bases [he] may pursue on habeas corpus." Ans., Exh. 10 at 4. The court agrees. Dutra now asserts only two of those claims.[3] Specifically, the court will address Dutra's claims that his right to due process was violated because: (1) of the Senior Hearing Officer's failure to disclose the confidential Wiley Report; and (2) there was insufficient evidence to support the committee's decision. Before addressing the merits of Dutra's claims, however, the court must first determine whether petitioner has properly invoked this court's jurisdiction.

I.   Federal Habeas Corpus Jurisdiction

A writ of habeas corpus is the appropriate federal remedy when "a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to an immediate *or speedier* release from that imprisonment." Preiser v. Rodriguez, 411 U.S. 475, 500 (1973) (emphasis added). Federal habeas corpus jurisdiction is available to a prisoner seeking "expungement of a disciplinary finding from his record

7

1  if expungement *is likely* to accelerate the prisoner's eligibility for parole." Bostic v. Carlson, 884
2  F.2d 1267, 1269 (9th Cir. 1989) (citing McCollum v. Miller, 695 F.2d 1044, 1047 (7th Cir. 1982))
3  (emphasis added); see also Docken v. Chase, 393 F.3d 1024, 1028–29 (9th Cir. 2004).
4  Expungement of a disciplinary finding is "likely" to accelerate a prisoner's eligibility for parole
5  when his claim has "a sufficient nexus to the length of imprisonment so as to implicate, but not fall
6  squarely within the 'core' challenges identified [in Preiser]." Docken, 393 F.3d at 1031. According
7  to Preiser, an inmate's claim strikes at the core of habeas corpus when it "attack[s] the very duration
8  of [his] physical confinement itself." 411 U.S. at 487–88. Therefore, a "sufficient nexus" exists,
9  and likewise habeas jurisdiction, where a prison inmate "seek[s] only equitable relief in challenging
10 aspects of [his] parole review that . . . *could* potentially affect the duration of [his] confinement."
11 Docken, 393 F.3d at 1031.
12       As a threshold issue, the court must clarify the proper standard to be applied. Respondent
13 cites Ramirez v. Galaza, 334 F.3d 850, 859 (9th Cir. 2003), for the proposition that habeas
14 jurisdiction is only proper when seeking expungement of a prison disciplinary finding "where a
15 challenge to prison conditions would, if successful, necessarily accelerate the prisoner's release." In
16 Ramirez, a California state prisoner brought a civil rights action under 42 U.S.C. section 1983
17 seeking damages, declaratory relief, and injunctive relief. Id. at 853. The petitioner's complaint
18 alleged that the procedures of his prison disciplinary hearing and the term of his administrative
19 segregation violated his constitutional rights. Id. at 852. The district court dismissed both claims.
20 Id. The Ninth Circuit reversed, holding that an inmate can "challenge the conditions of his
21 confinement under § 1983 [where] his claim, if successful, would not necessarily invalidate a
22 disciplinary action that affects the fact or length of his confinement." Id. In dicta, the Ramirez court
23 suggested that its holding "also clarifies our prior decisions addressing the availability of habeas
24 corpus to challenge the conditions of imprisonment." Id. at 858. To that end, the court suggested
25 that "habeas jurisdiction is absent . . . where a successful challenge to a prison conditions will not
26 necessarily shorten the prisoner's sentence." Id. at 859.
27       In 2004, in Docken v. Chase, the Ninth Circuit again addressed the habeas and section 1983
28 distinction. 393 F.3d at 1031. The prison inmate in Docken filed a habeas action arguing, inter alia,

8

that the parole board violated his constitutional rights by changing the period between his parole reviews from one year to five years. Id. at 1025–26. The district court dismissed the claim without prejudice reasoning that parole eligibility claims, unlike parole decision claims, could only be brought under 28 U.S.C. section 1983 because even if the prisoner's "claim succeeded, he would not be entitled to release." Id. at 1026. The Ninth Circuit reversed, holding that habeas jurisdiction exists "when prison inmates seek only equitable relief in challenging aspects of their parole review that, so long as they prevail, *could* potentially affect the duration of their confinement . . . ." Id. at 1031 (emphasis added). The court explained that even though parole eligibility claims "may not be the kind of 'core' challenge the Preiser Court had in mind, the potential relationship between [such claims] and the duration of [a prisoner's] confinement is undeniable." Id. at 1031. The court concluded by stating that "we are reluctant to unnecessarily constrain our jurisdiction to entertain habeas petitions absent clear indicia of congressional intent." Id. (citations omitted).

Docken distinguished Ramirez on other grounds. The Docken court explained, "[u]nlike this case, Ramirez concerned a challenge to internal disciplinary procedures and the administrative segregation that resulted from it. Ramirez's suit did not deal with the fact or duration of his confinement." 393 F.3d at 1030 n.4. However, a challenge to internal disciplinary procedures may implicate "the fact or duration of [an inmates'] confinement." Preiser, 411 U.S. at 489. Prison disciplinary hearings may have potential consequences upon parole decisions involving the fact or duration of confinement. This is particularly true because these hearings must comport with certain minimum due process standards. See Wolff v. McDonnell, 418 U.S. 539, 560–74 (1974). Moreover, convictions secured for disciplinary violations in such a proceeding may be a factor in an inmate's parole consideration hearing. Ultimately, such a conviction may well affect the duration of an inmate's confinement and, if so, implicate federal habeas jurisdiction. Docken so suggests. See 393 F.3d at 1031. As in Docken, Dutra's claim is for equitable relief under AEDPA, not damages under 28 U.S.C. section 1983. Accordingly, the standard enunciated in Docken applies here.

Under Docken, the question before the court is whether expungement of Dutra's disciplinary violation is "likely" to accelerate his eligibility for parole, Bostic, 884 F.2d at 1269, or "could potentially affect the duration of his confinement. Docken, 393 F.3d at 1031. As a matter of law, it

is well established that a disciplinary violation may affect the duration of an inmate's confinement. Pursuant to CCR section 2402(a), a prisoner that "will pose an unreasonable risk of danger to society if released from prison" is not suitable for release from prison, regardless of the amount of time served. In considering suitability, the Board is required to consider "all relevant, reliable information available," including "involvement in other criminal misconduct which is reliably documented" and "behavior before, during, and after the crime." 15 Cal. Code Regs. § 2402(b). The circumstances tending to show unsuitability include whether "[t]he prisoner has engaged in serious misconduct in prison or jail." Id. § 2402(c)(6). Likewise, institutional behavior is given additional consideration amongst the circumstances tending to show suitability for parole because "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Id. § 2402(d)(9). The unsuitability and suitability factors are "set forth as general guidelines" to be considered by the parole board. Id. § 2402(c), (d).

Dutra's disciplinary violation is precisely the sort of relevant information that section 2402(b) requires parole boards to consider. Dutra's disciplinary violation for attempting to undermine the CCP at the California Men's Colony is "criminal misconduct which is reliably documented." See id. § 2402(b). Moreover, the statute also mandates that the violation be considered because it reflects on Dutra's behavior "after the crime." See id. Thus, Dutra's institutional behavior, impeccable except for the disciplinary violation, is a double-edged sword that is given consideration as a factor indicating both suitability and unsuitability for parole. Id. § 2402(c),(d).

Petitioner also argues that the Board's and Governor's practice of alternating the grounds upon which inmates are found unsuitable for parole is evidence that the disciplinary violation has affected the deferral of his parole and will continue to do so in the future. For support, petitioner cites Martin v. Marshall, 448 F. Supp. 2d 1143 (N.D. Cal. 2006) (Patel, J.). In Martin, this court ordered that a prisoner be released on parole and noted with concern that the Board "appear[ed] to have capitulated to [a] blanket no-parole policy" and had "abandon[ed] its role as an independent assessor of petitioner's eligibility." Id. at 1144. Among other documented inconsistencies, the Board incongruously cited "the fact that petitioner had committed no severe violations of prison

10

1 rules . . . to support release in 2003, while one of the same non-severe offenses was found to weigh
2 against release in 2004." Id.  Here, however, there is no evidence that the Board has alternated the
3 grounds recited to find Dutra unsuitable for parole or will do so in the future.  Nonetheless, the
4 existence of such a practice lends credence to Dutra's argument that the disciplinary violation "could
5 potentially affect" the duration of his confinement.  Accordingly, the court finds that expungement
6 of Dutra's prison disciplinary violation, if warranted, could affect the duration of his confinement by
7 making it more likely that he would be granted parole.  Thus, addresses the merits of Dutra's claims.

II. Due Process

Pursuant to AEDPA, the issues presented are whether the state court's decision was either: (1) contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or (2) based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  The court considers each argument in turn.

A. Contrary to or an Unreasonable Application of Clearly Established Federal Law

A state court's denial of an application for a writ of habeas corpus is "contrary to" federal law when it "applies a rule that contradicts the governing law set forth in [U.S. Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the U.S. Supreme Court] and nevertheless arrives at a [different result]."  Lockyer, 538 U.S. at 73 (citations and internal quotations omitted).  On the other hand, a state court's finding is an "unreasonable application" of federal law when it "identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 75 (quoting Williams v. Taylor, 529 U.S. 362, 410, 412 (2000)).  "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous."  Id. (citations and internal quotations omitted).  Instead, a reversal of the state court's determination of a legal question is only appropriate where the state court's application is found to be objectively unreasonable.  Id. at 76.

11

Before the Superior Court, Dutra argued that his disciplinary violation should be expunged and the charges dismissed because the Senior Hearing Officer's decision was based on the testimony of unreliable confidential informants. Addressing Dutra's reliability argument, the state court cited the Supreme Court's opinion in Wolff for the proposition that "punishment of an inmate based on information that is not completely disclosed may occur in prisons." Ans., Exh. 10 at 5. In Wolff, the Court established a set of procedural safeguards designed to ensure that prison officials comply with the mandates of due process when conducting prison disciplinary hearings. 418 U.S. at 564–70. One such safeguard was the provision that "there must be a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action." Id. at 564 (citation and internal quotations omitted). Yet, the Wolff Court also warned that "there will be occasions when personal or institutional safety is so implicated that the statement may properly exclude certain items of evidence . . . ." Id. In these circumstances, the Court further required that the factfinder's written statement "should indicate the fact of the omission." Id.

The Superior Court's decision was not contrary to clearly established federal law. First, the record contains no indication, and Dutra has not suggested, that the Superior Court reached a different result than the U.S. Supreme Court did when facing "materially indistinguishable facts." Lockyer, 538 U.S. at 73. Second, the Superior Court did not apply Wolff so as to "contradict[] the governing law set forth in [U.S. Supreme Court] cases." Id. Indeed, the Superior Court's decision was entirely consistent with the Supreme Court's holding in Wolff because the Senior Hearing Officer's written statement complied with Wolff's mandates. The Senior Hearing Officer produced a written statement summarizing the evidence relied upon, including "the submitted Rules Violation Report, Investigative Employee Report, and the [Wiley Report]." Ans., Exh. 3 at 3. The written statement also explained that the Wiley Report met the requirements for confidentiality because "the information if known to the inmate, would endanger [the informants], and would jeopardize the security of the institution." Id. The written statement further complied with Wolff's requirement that the fact of an omission be noted within the report by stating that the "investigation included information from confidential informant[s]." Id. at 2. The Superior Court applied federal law faithfully and correctly cited Wolff to establish that prison officials are, in appropriate

12

1    circumstances, permitted to punish an inmate "based on information that is not completely
2    disclosed." Ans., Exh. 10 at 5. Accordingly, the Superior Court's decision was not contrary to
3    clearly established federal law.

4        The Superior Court's decision also did not involve an unreasonable application of federal
5    law. As an initial issue, the state court primarily relied on California law, and did not specifically
6    apply Wolff, in determining that the informant's statements were reliable. Instead, the state court
7    cited Wolff to establish that the mere usage of confidential information in a prison disciplinary
8    hearing is not a violation of due process. See Ans., Exh. 10 at 5. Nevertheless, the Superior Court
9    did not err in the manner described in Lockyer by "identif[ying] the correct governing legal principle
10   . . . but unreasonably appl[ying] that principle to the facts of the prisoner's case." 538 U.S. at 75.
11   In Wolff, the Supreme Court expressly provided that confidential information may be withheld from
12   the committee's written statement where institutional or personal safety is implicated, so long as the
13   fact of the omission is noted in the written statement. 418 U.S. at 565. The Senior Hearing Officer's
14   report clearly noted the omission of the confidential report. Ans., Exh. 3 at 3. The written statement
15   explained that the Wiley Report met the requirements for confidentiality because "the information if
16   known to the inmate, would endanger [the informants], and would jeopardize the security of the
17   institution." Id. at 2. The question, therefore, is whether the Superior Court unreasonably
18   determined that institutional or personal safety was implicated by the confidential information in the
19   Wiley Report.

20       Based on an in camera review of the Wiley Report and, in consideration of the Superior
21   Court's analysis, this court cannot conclude that the state court's application was objectively
22   unreasonable. Petitioner Dutra was convicted of murdering his wife by strangulation. Ans. at 2.
23   While in custody, Dutra's behavior, while generally commendable, became erratic after Father
24   Stevenson's arrival. After being denied unsupervised access to the chapel office, Dutra abruptly
25   ended his sixteen year association with the CCP. Pet. at 4. Dutra then began making threatening
26   remarks about Father Stevenson and received a reprimand. Ans. at 10. Upon these facts, this court
27   cannot say that the Superior Court's application of Wolff was objectively unreasonable. Based on
28   Dutra's violent history and erratic behavior, the Senior Hearing Officer reasonably determined that

Dutra posed a threat to institutional safety and the safety of the unidentified inmate informants. Thus, the Superior Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

### B. Unreasonable Determination of the Facts

In assessing whether there has been an unreasonable determination of the facts, the court will address the following two issues: (1) whether "some evidence" supports the disciplinary board's determination of the facts; and (2) whether that evidence was reliable.

The Supreme Court's decision in Superintendent v. Hill, 472 U.S. 445, 455–56 (1985), provides that "the requirements of due process are satisfied if some evidence supports the decision by [a] prison disciplinary board." This standard is met so long as there is "some evidence from which the conclusion of the administrative tribunal could be deduced . . . ." Id. at 455 (citations omitted). The "some evidence" standard "does not require examination of the record, independent assessment of the credibility of witnesses, or weighing of the evidence." Id. This is because "the fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." Id. at 456.

Some evidence supports the Senior Hearing Officer's determination of the facts. In finding Dutra guilty of attempting to undermine the CCP, the Senior Hearing Officer relied on the information contained in the Wiley Report, the Rules Violation Report and the statements taken by Officer Torres. Ans., Exh. 3 at 4. The Wiley Report contained several firsthand accounts of Dutra's behavior which described how Dutra and the alleged co-conspirators used the chapel as a hangout, denied certain inmates access to the family services program, sold food designated for the family services program on the yard and used the chapel bathroom for trysts with their wives. Ans. at 2. The Wiley Report also relates that Dutra made several threatening statements regarding Father Stevenson while actively discouraging other inmates from participating in the CCP. Id. at 10, 2.

The information contained in the Wiley Report is supplemented by the statements in Officer Torres' report. First, inmate Anzoategui's statement confirms some of the above facts. Ans., Exh. 3 at 6. Anzoategui indicated, for example, that Dutra and the alleged co-conspirators used their

authority at the chapel office to give their friends preferential treatment. Id.  Second, Father Stevenson's statement revealed that Dutra and the alleged co-conspirators reacted poorly to the news that he was putting an end to their misconduct. See id.  Third, Lieutenant Fisher stated that Dutra and the alleged co-conspirators' behavior was particularly troubling because "the Father [was] usually by himself inside the Catholic Chapel." Id.  Upon this evidence, the Senior Hearing Officer found that Dutra was guilty of attempting to undermine the CCP. Id. at 4.  After an in camera review of the Wiley Report, the Superior Court found that there was "absolutely no question that there was 'some evidence' that . . . [Dutra and the alleged co-conspirators] attempted to weaken Father Stevenson's control by denouncing his programs and making verbal threats that they would 'take him down.'" Ans., Exh. 10 at 7.  The court agrees.  After an in camera review of the Wiley Report, the court is satisfied that "some evidence" supports the conclusion reached by the Senior Hearing Officer.

Moreover, the above cited evidence was reliable.  It is well established that "there must be some indicia of reliability of the information that forms the basis for prison disciplinary actions." Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987).  A prison disciplinary committee's reliance on the statements of "an unidentified inmate informant satisfies due process when: (1) the record contains some factual information from which the committee can reasonably conclude that the information was reliable, and; (2) the record contains a prison official's affirmative statement that safety considerations prevent the disclosure of the informants name." Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir. 1987).

First, the record contains sufficient detail to establish the reliability of the confidential informants.  Reliability is established either by the oath of the investigating officer, corroborating testimony, a statement on the record by the chairman of the committee indicating that he had firsthand knowledge of the sources of the information and that he considered them reliable based on the informant's record, or in camera review of the documentation from which informant credibility was determined. Id. at 186–87.  Here, the reliability of information provided was established in three distinct ways.  First, the three unidentified inmate informants who provided most of the information had proven reliable in the past. See Ans. at 11.  Second, the information provided by

1 these reliable informants was further corroborated by four other confidential sources who
2 independently provided the same information. See id. Third, part of the information provided by
3 these confidential informants was later corroborated by prison officials in an independent
4 investigation of the matter. See id.

5 Upon these facts, the Superior Court determined that the informant's information was
6 reliable. To ascertain the reliability of the informant testimony and the nature of the risk, the
7 Superior Court undertook a sua sponte review of the Wiley Report to assess "whether the hearing
8 officer reasonably could have determined that the information was reliable, and whether the
9 information, if reliable, [was] sufficient to support the guilty finding." Ans., Exh. 10 at 6. This in
10 camera review persuaded the Superior Court of the veracity of the information documented in the
11 Wiley Report. The court noted that Lieutenant Wiley interviewed seven inmate witnesses and one
12 staff witness in addition to Father Stevenson and the four accused inmates. Id. Furthermore,
13 Lieutenant Wiley memorialized his findings in a fifteen page, single spaced, type written report. Id.
14 Lastly, the court recognized that all eight nonparty witnesses provided some firsthand information.
15 Id. In sum, the Senior Hearing Officer's reliance on unidentified informants was reasonable.
16 Accordingly, the first prong of Zimmerlee has been met.

17 To comply with the mandates of due process, however, the prison officials were also
18 required to meet the second prong of Zimmerlee by making an affirmative statement that safety
19 considerations prevented disclosure. The Rules Violation Report explains that the prison's
20 "investigation included information from confidential informant[s]." Ans., Exh. 3 at 2. The Report
21 described how the information met "the criteria for reliability per [CCR] Section 3321(c) . . . ." Id.
22 It explains that the confidential information couldn't be provided to Dutra because "to do so may
23 jeopardize the safety of the informants." Id. The Report was signed by Lieutenant Wiley. Id. Thus,
24 Zimmerlee's second prong requiring a prison official's affirmative statement that safety
25 considerations prevent disclosure has been met.

26 Both prongs of Zimmerlee have been met; the information provided by the undisclosed
27 informants was reliable. Accordingly, having determined that some evidence supports the state
28 court's adjudication of Dutra's claim and that the evidence relied upon satisfied all the requirements

16

of due process, the court is satisfied that the Superior Court's denial of Dutra's petition for a writ of habeas corpus was proper. Thus, Dutra has failed to establish his entitlement to relief under either sections 2254(d)(1) or 2254(d)(2).

CONCLUSION

    For the foregoing reasons the petition for writ of habeas corpus is DENIED.

IT IS SO ORDERED.

Date:   November 5, 2007

                                                  MARILYN HALL PATEL
                                                United States District Court Judge
                                                Northern District of California

ENDNOTES

1. Some of the facts in this background section derive from documents filed under seal with the court. Particularly, the facts have been gleaned from Ans., Exhs. 4–6.

2. For purposes of brevity, the court will refer to the group of inmates encompassing Steven Murphy, James Marvin, Benny Ros, and Gerald Shil as Dutra's "alleged co-conspirators." This usage, however, is not intended to be suggestive of the ultimate legal questions at issue in this action.

3. In fact, Dutra asserts that his regulatory and statutory due process protections were abrogated when he was: (1) deprived of his right to present requested witnesses who would have provided exculpatory evidence, for which the hearing officers gave no reason; (2) deprived of his right to receive copies of crucial non-confidential documents that were to be relied on by the Hearing Officer; (3) deprived of effective assistance of the investigative employee, necessary due to his segregated confinement; and (4) not informed of crucial facts explaining the "when, where, and to whom" of the alleged misconduct or what statements or actions constituted it. Pet. at 2. Not all of these claims were exhausted before the state courts. Consequently, like the Superior Court, this court addresses only those claims which petitioner has exhausted.